**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **19-20036-CR-MARTINEZ(s)**

**UNITED STATES OF AMERICA,**

vs.

**FRANCISCO JOSEPH ARCILA**
**RAMIREZ,**

     **Defendant.**
_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A DOWNWARD DEPARTURE AND/OR VARIANCE PURSUANT TO THE TITLE 18 U.S.C. § 3553(A) FACTORS

The defendant, Francisco Joseph Arcila Ramirez (hereinafter referred to simply as "defendant") filed the above captioned motion on January 7, 2020 (Docket Entry "D.E." 123).[1] Defendant asks this Court to grant him a downward departure and/or variance on the bases that: (1) his guideline range does not adequately provide him with the benefit of acceptance of responsibility as contemplated by Section 3E1.1 of the Guidelines; (2) he must be granted a downward variance in order to avoid an unwarranted sentencing disparity between his sentence and that of other defendants convicted of a violation of Title 18 U.S.C. § 2339B here and elsewhere in the Country; (3) he now is cooperating with the government; (4) his personal characteristics and history, alone or together with, (5) the nature and circumstances of his criminal activity in this case, "provide [a] well founded basis" for the Court to depart or vary (D.E. 123 at pp. 11-14).

---

[1] Arcila Ramirez also filed an earlier eighteen page pleading in advance of sentencing styled as "Defendant Francisco Joseph Arcila Ramirez' Objections to the Presentence Investigation Report" (D.E. 122). The government will be concurrently filing a separate response in this case in opposition to those filed objections.

The government opposes the defendant's motion, and contends, as set forth in greater detail below, that none of these facts or claims justify a departure or variance below the advisory guidelines in this very serious case. As defendant's guilty plea and PSI make clear, his case is an aggravated one squarely deserving of the Guideline Section 3A1.4 terrorist enhancement, one where the defendant exhibited no qualms or hesitation about serving, and continuing to serve, as a weapons supplier for a designated terrorist group, the ELN, with a decades long history of terrorism and terrorist acts in the defendant's own country of birth and citizenship.

Congress instructs that while it is appropriate for courts to consider subjective arguments like most of the above arguments being made by the defendant in the present pleading, they must be evaluated against a backdrop of objective factors such as considerations involving the seriousness of the offense, and the need for both specific and general deterrence. *See* 18 U.S.C. § 3553(a). The government respectfully submits that the societal needs to punish and deter reprehensible criminal and amoral conduct of the type committed by defendant here weighs against granting any departure or variance in this case.

## I. INTRODUCTION AND GENERAL FACTUAL BACKGROUND

In March 2019, a federal grand jury returned an eight count superseding indictment against defendant alleging conspiracies to illegally deal in firearms and providing material support to a designated foreign terrorist organization, along with substantive counts of making false statements in connection with the acquisition of firearms, dealing in firearms without a license, and providing material support to a foreign terrorist organization (D.E. 37). Defendant ultimately pled guilty to Count Eight of the indictment, providing material support to a foreign terrorist organization in violation of Title 18, United States Code, §§ 2339B(a)(1) and 2, and the government agreed to dismiss the remaining counts against him (D.E. 90, 92).

The PSI and defendant's stipulated factual proffer statement (D.E. 118,91) collectively provide the Court with a detailed and thorough recitation of the full facts of defendant's extensive scheme to illicitly export firearms, firearms parts, and ammunition to Colombia and thereafter to clandestinely and illegally sell them there to terrorists and other criminals. In order to carry off this callous scheme, defendant seduced and enlisted co-defendants Gregory Ortega and James Smith to commit federal firearms crimes here by serving as his "straw" purchasers to procure firearms he wanted for his illicit weapons sales in Colombia, including the six AK-style pistols he sold to the ELN. (D.E. 91at ¶¶2-5; PSI at ¶¶22, 30-31).

**1.** *The Seriousness of the Offense and the Defendant's History and Characteristics*

The defendant stands before this Court as a mature 36 year old and the unquestioned leader and organizer of a clandestine scheme he clearly intended to make an ongoing illicit pipeline to Colombia for powerful and highly destructive firearms to be sold by him there to terrorists and other criminals. (D.E. 91at ¶2; PSI at ¶ 38). He has described his childhood and upbringing as middle class, with no instances of childhood trauma, abuse or mistreatment. (PSI at ¶ 64). Additionally, he has reported no prior history of mental or emotional health issues, alcohol abuse, or drug abuse. (PSI at ¶¶ 74-75). In short, defendant had a normal childhood and upbringing with no coping or substance abuse issues.

Turning to defendant's criminal activities in this case, as a brief overview, between approximately December 2017 and August 2018, defendant directed the illegal purchase of approximately 45 firearms by the various straw purchasers he had enlisted and then sold those weapons throughout Colombia. (PSI at ¶17). In fact, in just five months, between, April 24, 2018,

3

and August 16, 2018, a single "straw" purchaser for defendant, co-conspirator and co-defendant James Smith, succeeded in illicitly obtaining 14 7.62 mm pistols and 9 Glock 9mm pistols for defendant (D.E. 52, Atch 1).

Of those firearms, as defendant admitted during his guilty plea, six (6) of them were sold and delivered directly to the ELN with defendant's direct knowledge and assent. (DE 91 at¶¶ 2-5; PSI at ¶¶17, 26-31). Clearly highly motivated by the successful completion of that sale, defendant returned to South Florida and immediately moved to ramp up his stockpile of weapons, ammunition, and weapons parts seeking a bigger financial score. As part of that focus, defendant concentrated on bringing larger quantities of firearm components (triggers, rifle barrels, lower assault rifle receivers) to Colombia for weapons assembly, instead of smuggling fully complete weapons into Colombia. Doing this was not only cheaper (and therefore stood to provide him with a higher profit margin), but it also made smuggling easier, and dispensed with the need to use straw purchasers. ( PSI at ¶¶ 32-34). In fact, in less than a month, between September 12, 2018, and October 2, 2018, defendant quickly assembled an arsenal of 400 AK-47 30 round magazines, 80 AR-15 assault rifle 30 round magazines, and 35 assault rifle barrels and covered his tracks by using both his girlfriend's and co-defendant Ortega's girlfriend's credit card to make those purchases.

While in the midst of collecting these purchases, in a recorded phone call with a confidential source, when the source represented to defendant that the ELN was eager to obtain these parts and others that defendant had assembled as soon as possible, defendant could scarcely contain himself and exclaimed "Wow." (PSI at ¶¶ 32-34). By October 2, 2018, defendant was already ready to make a new weapons deal and smuggle the weapons parts he had assembled down to Colombia. Moving quickly, defendant once again purchased several Husky air compressors at

a local South Florida Home Depot (his preferred means of smuggling guns, ammunition, and weapons parts out of South Florida and down to Colombia) for him to use to conceal the weapons parts from customs inspectors both here and in Colombia . (PSI at ¶ 32).

Two weeks after buying the compressors, defendant was back in Colombia, flying from Miami to Cartagena. Once there, defendant met with the confidential source and told him that he needed some monies to get the shipping container that was holding the smuggled gun parts hidden inside the air compressors released from Colombian authorities. Defendant was able to get the container released and the firearm parts were dispersed to the homes of two close associates, his brother and a Colombian attorney who defendant was friends with. (PSI at ¶ 33).

Aware of defendant's plans to attempt to once again supply the ELN with weapons, the Colombian National Police moved in and raided both homes. On October 31, 2018 and November 1, 2018, Colombian National Police arrested defendant's brother and defendant's attorney friend in Barranquilla, Colombia. During the course of those arrests, Colombian authorities seized 35 AR-15 assault rifle lower receivers, 400 AK-47 30 round ammunition magazines, 80 AR-15 30-round ammunition magazines, 390 assorted ammunition magazines, 28 AR-15 assault rifle pistol grips, 68 AR-15 assault rifle lower receiver build kits, and approximately 47 assault rifle barrels. At the search locations Colombian law enforcement also found the Husky compressors, now broken apart. (PSI at ¶ 34).

When defendant was later arrested, in January 2019, after receiving and waiving his *Miranda* rights, he admitted that he directed Smith and Ortega to make straw purchases of firearms on his behalf. He also admitted that he deliberately concealed the firearms in the Husky air compressors and smuggled them into Colombia for resale, He also admitted that he paid each of the "straws" only $200 per firearm, and then resold each weapon for $1,400 in Colombia. (PSI at ¶

5

35).

Finally, defendant reluctantly admitted that the firearms he sent to Colombia "ha[d] to be for guerillas or delinquents… you know, they (the weapons) went to Venezuela… I would think it has to [be] guerillas… because over there, ELN is over there." And he admitted that he had moved to assembling stockpiles of weapons parts rather than persisting with using "straws" in South Florida, because he knew that "it was better for them [the guerrillas] to get the [firearms] parts because if it was taken apart it was cheaper." (PSI at ¶ 36).

### 2. *Defendant's Articulated Grounds for Departure/Variance*

Notwithstanding the aggravated and extensive nature of his criminal activity in this case, defendant makes essentially three arguments in his instant motion to try to convince this Court that it should depart or vary from the advisory guideline range in his case. First, defendant argues that his current guideline range (the statutory maximum of 240 months) renders his acceptance of responsibility points a nullity and that he should therefore be awarded a variance from that range equal to a three-point deduction from the offense level that is equivalent to 240 months. Second, defendant devotes much of the instant motion attempting to imply to the Court that, in federal cases across the country where the USSG§ 3A.1.4 terrorism enhancement has been enforced, defendants' sentences routinely receive downward variances below either the statutory maximum sentence and/or their advisory guideline range (D.E. 123 pp. 7-11) and he must therefore receive a downward variance in his sentence to avoid an unwarranted sentencing disparity.

Finally, defendant asks this Court to consider his post-arrest interest in cooperating with the government, his lack of criminal history, his "good" family history, and his purported "low risk of recidivism," as grounds for the imposition of a sentence below the advisory guidelines. The

government respectfully submits that none of these pose any meritorious grounds for departure or variance in this case.

### A. Acceptance of Responsibility

Defendant correctly observes that given the advisory Sentencing Guideline Range and the statutory maximum, credit for his affirmative and timely acceptance of responsibility does not result in an advisory Guideline range below the statutory maximum. The 11th Circuit in *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995) recognized the discretion of a District Court in such instances to sentence the defendant below the statutory maximum as an appropriate departure. However, *Rodriguez* was a *pre-Booker* case and much of its logic is now outdated. *Post-Booker,* the Court has the discretion, after consideration of the advisory guideline range, to pronounce any sentence from probation up to 240 months' imprisonment after consideration of the sentencing factors under Title 18, United States Code, § 3553.

That said, obviously, the starting point for the Court's consideration of the appropriate sentence in this case is the advisory guideline range of 240 months imprisonment. But, when examining the appropriateness of that guideline range it should be borne in mind that the defendant's plea bargain limiting his sentencing to a single count has already led to a steep reduction in his potential sentencing exposure. As provided for in defendant's plea agreement (*see* p.1, ¶ 2), defendant bargained away seven additional counts which, upon conviction, would have rendered a stacked statutory maximum penalty of 90 years, well in excess of the 240 month statutory maximum sentence of Count 8. Extracting that concession from the government was hardly meaningless.

Under USSG § 5G1.2(d), *Sentencing on Multiple Counts of Conviction*, had defendant pled or been convicted at trial of any of Counts 2 through 5, or Count 7, the operation of that Guideline

subsection would have led to defendant essentially facing the full guideline range applicable to his case. The subtraction of three points for acceptance of responsibility would have translated to exposure to a guideline sentencing range (at the low end) of 324 months, not 240 months. Therefore, the defendant has already obtained a substantial benefit through charge negotiation; a benefit intended by the United States to take into account the defendant's acceptance of responsibility and his newfound willingness to begin to cooperate with law enforcement.

Of course, now in his motion for a downward variance or departure, that hugely significant concession is nowhere discussed by defendant. The bottom line is that defendant has already received somewhere between an 84 to 120 month variance through successfully charge bargaining in this case. Any further analysis of a variance or departure by this Court below the 240 month statutory maximum should not fail to take into account defendant's already-won 84 to 120 month variance. To do otherwise is to provide defendant with an additional windfall that, the government submits would result in a sentence that fails to adequately punish the defendant for his criminal conduct.

As noted earlier, defendant relies upon *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995) and Sentencing Guidelines Section 5G1.1(a) to support his argument that he is not fully benefitting from a 3-level reduction in his offense level due to acceptance of responsibility. D.E. 123 at pp. 3-7. The Eleventh Circuit considered and rejected arguments similar those raised by defendant in *United States v. Gillette*, 485 Fed. Appx. 416 (11th Cir. 2012). The defendant in *Gillette* pled guilty to distributing child pornography in violation of Title 18, United States Code, Section 2252(a)(2) and received a sentence at the statutory maximum (20 years) for that crime. Like defendant here, Gillette charge bargained a guilty plea to a single count that carried a statutory maximum penalty of 240 months, and received a PSI determination that his applicable guideline

8

range was 210 to 262 months. *See Gillete*, 485 Fed.Appx. at 417.

Prior to his sentencing hearing, Gillette objected to the PSI, arguing that, under *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995), he should receive a downward departure for acceptance of responsibility. *Gillete*, 485 Fed.Appx. at 417. He asserted that, without such a reduction, his guideline range would be above the statutory maximum sentence and he, (like defendant argues here), would receive no benefit from his acceptance of responsibility. *Id*. The District Court denied Gillette's motion and the Eleventh Circuit affirmed Gillette's sentence, holding that *Rodriguez* was inapplicable to Gillette's case because Gillette's guideline range did not exceed his statutory maximum sentence. *Id*. at 420. The Court also emphasized that its decision in *Rodriguez* was made at a time when the Sentencing Guidelines were mandatory. *Id*. At 419.

As the Court found in *Gillette*, here defendant also benefits from his plea to a charge with a statutory maximum sentence of 240 months. This is because, assuming this Court overrules his objections to the PSI, his guideline range is between 360 months to life. Put another way, defendant is guaranteed to receive a sentence well below what would otherwise have been his guideline range if any of Counts 2-5 and 7 would not have been agreed to be dismissed by the government. This Court should reject defendant's arguments in support of his effort to further depart/vary his sentence.

### B. Alleged Need for A Non-Disparate Sentence.

Defendant insinuates that the Court will fail to adequately weigh and assess the §3553(a) factors in sentencing him unless it varies downward under §3553(a)(6), because, he asserts, there is a need to avoid sentence disparities among similar defendants ((D.E. 123 pp. 7-11)).  That argument is baseless.

First of all, it is clear that, at his sentencing, this Court will weigh and assess all of the §3553(a) factors before imposing defendant's sentence. Second, unwarranted disparity can only exist between individuals who are similarly situated. "A well-founded claim of disparity . . . assumes that apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quotation omitted). *See United States v. McNair*, 605 F.3d 1152, 1231-32 (11th Cir. 2010) (defendant cannot show unwarranted disparity unless he has shown that he is similarly situated). Specifically regarding §3553(a)(6), defendant's contention that the Court errs unless it compares his sentence to **all** similarly-situated defendants around the country is itself simply clear error. This court is not required to undertake a massive survey of all 18 U.S.C. §2339B sentences across the country. Neither, contrary to defendant's wish, is it under any obligation to expand that survey to include **any** defendant's sentence, regardless of the federal crime they were convicted of , as long as they received a USSG §3A1.4 terrorism enhancement, before it can properly address §3553(a)(6). The Eleventh Circuit has made it clear that a sentence imposed in this Circuit is not necessarily subject to a "national grade curve." *United States v. Hill*, 643 F.3d 807, 885 (11th Cir. 2011).

This Court need only avoid **unwarranted** sentencing disparities among defendants with similar records who were convicted of similar conduct and sentenced under the same or similar facts and circumstances as the defendant. Therefore, defendants who cooperate with the government, enter into written plea agreements, receive a government motion to reduce their sentence and thereafter receive a sentence reflecting a substantial assistance reduction are not similarly situated to defendant. *See, e.g., United States v. Docampo*, 573 F.3d at 1101 (11th Cir. 2009). Likewise, a defendant who is a mature adult, whose total offense level initially calls for an advisory guidelines sentence of 360 months, and, is a leader/organizer of an extensive scheme

10

to smuggle weapons to sell to a violent terrorist organization for profit is distinguishable from 17,18, 19, or 20 year old defendants who have psychological or emotional problems and delude themselves into believing that offering their own bodies in service to a jihadist organization is a religious duty. In fact, defendant's offered sampling of cases that he identifies in his pleadings as allegedly similar to his own are, in the vast majority of cases, completely distinguishable. some had pleaded guilty, cooperated, and received USSG §5K sentence reduction motions, some had plea agreements that limited their sentencing exposure, others had significant emotional and mental health issues, and others had substantially lower total offense levels.[2]

Moreover, as defendant himself concedes, a substantial number of cases cited by him (including all three cases cited by him that are Eleventh Circuit cases) were ones where, in fact, the defendant was sentenced to a statutory maximum sentence.[3] Therefore, defendant's effort to portray himself as similar to those defendants is simply untrue.

### C. Lack of Criminal history, "Good" Family History, and Purported "Low Risk of Recidivism," As Grounds for the Imposition of a Sentence Below the Advisory Guidelines.

Finally, defendant generally argues that he should receive a variance due to his "good" family history, purported "low risk of recidivism," and lack of prior criminal history (D.E. 123 at pp. 11-14). In support of these arguments defendant cites no authority aside from making general references to subsections (a)(1) and (2) of Title 18 U.S.C. §3553(a). Nothing in either Defendant's

---

[2] For the Court's convenience the government has attached a list of defendant's "sampling of cases in which the particular defendant was convicted of 18 U.S.C. §2339B . . .by plea of guilty" that he has provided in his pleadin, along with annotations of what the court records (where available) in those cases reflect about the reasons offered for the particular sentences that were adjudicated. With many of the cases cited in defendant's sample the government was able to retrieve the actual sentencing transcripts and examine them. The case list with annotations is attached to this pleading as Attachment A.

[3] 18 U.S.C. §2339B was amended June 2, 2015 to increase the maximum statutory sentence to 20 years imprisonment from 15 years imprisonment.

PSI or his pleadings filed with this Court provides any dramatic extenuating circumstances and the matters cited by defendant such as his "good family history" and general lack of prior criminal history certainly provide nothing additionally extraordinary or mitigating. In fact, it can certainly be argued that these are actually matters in aggravation in this case, given that despite the advantages of good family, loving parents, and a solid middle class upbringing, defendant chose to commit the extremely serious criminal activity that he did in this case. In any event, such factors merely constitute only a few of the factors that the Court must consider under Title 18 U.S.C. §3553(a). The weight given to each factor in §3553(a) is within the district court's discretion and the district court is "permitted to attach great weight to one factor over others." *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (internal quotation marks omitted). In this case, the government respectfully submits (set forth in further detail below) that such 3553(a) factors as "the nature and circumstances of the offense"; the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant" are sufficiently aggravating factors far outweighing defendant's claimed mitigating factors. 18 U.S.C. §3553(a)(1), (a)(2)(A) and (B).

Finally, defendant contends that this Court should consider his recent effort to turn over a new leaf and cooperate with the government as a basis for granting him a downward variance. It is far too early to evaluate whether defendant will be a suitable cooperator to the government in any subsequent prosecution. Two initial meetings with defendant occurred after his guilty plea and while these initial meetings seemed promising, it is way too early for the government to reach a conclusion that his information will prove credible and useful. Should the government's evaluation of defendant's cooperation reach a point where it concludes that real substantial assistance has

been provided, then a post-sentencing reduction under Fed. R. Crim. P. 35 may be appropriate. That is not the case now. The government respectfully requests that this Court reject defendant's preliminary efforts at cooperation as a viable ground for a downward variance in this case.

### 3. *The Need to Punish, Deter and Promote Respect for the Law*

It scarcely needs to be said that providing material support to a designated foreign terrorist group is a serious offense. When that material support is eagerly wishing to provide high powered firearms, ammunition, and high capacity magazines that exponentially enhance the killing power of such firearms the aggravated nature of the criminal activity defendant perpetrated in this case is manifest. Under such circumstances, both general and specific deterrence is key. The government respectfully submits that general deterrence is particularly important here because other would-be perpetrators are watching. Lenient sentences for crimes like the one committed by defendant would send a dangerous message to the community that being a weapons merchant to terrorists and other criminals (with, as defendant admitted, a profit margin exponentially greater than the cost of the firearms and firearms parts he illicitly procured here in our District), is worth the risk of being caught and having to serve time in prison.

**[SPACE INTENTIONALLY LEFT BLANK]**

## II. CONCLUSION

For all of the above reasons this Court should deny the defendant's motion for downward departure or variance and sentence him to the advisory guideline term of incarceration of 240 months.

                        Respectfully submitted,
                        ARIANA FAJARDO ORSHAN
                        UNITED STATES ATTORNEY

By:    /s/ Randy A. Hummel_____
            Randy A. Hummel
            Assistant United States Attorney
            Fla. Bar No. 973378
            99 Northeast 4th Street
            Miami, Florida 33132-2111
            Tel: (305) 961-9299
            Fax: (305) 530-7087

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 13, 2020, I electronically filed the foregoing Response in Opposition to Defendant's Motion for A Downward Departure And/Or Downward Variance Pursuant to the Title 18 U.S.C. §3553(a) with the Clerk of the Court using CM/ECF.

/s/ Randy A. Hummel
Randy A. Hummel
Assistant United States Attorney